1  TODD M. MALYNN (SBN 181595)
   tmalynn@polsinelli.com
2  POLSINELLI LLP
   2049 Century Park East, Suite 2900
3  Los Angeles, CA 90067
   Telephone:  310.556.1801
4  Facsimile:   310.556.1802

5  Attorneys for Defendant
   PENGUIN MAGIC, INC.
6

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| YIGAL MESIKA, an individual, | Case No. 2:15-cv-09314-RGK-DTB |
| Plaintiff, | **PENGUIN MAGIC, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |
| vs. | |
| PENGUIN MAGIC, INC., a Nevada corporation, DOES 1-10, inclusive,, | |
| Defendant. | |

Judge:     Hon. R. Gary Klausner

Date:    October 31, 2016
Time:    9:00 a.m.
Place:   Courtroom 850
         255 E. Temple St.
         Los Angeles, CA  90012

Pursuant to Fed. R. Civ. P. 56, Defendant Penguin Magic, Inc. ("Defendant" or "Penguin Magic") respectfully submits the attached Memorandum of Points and Authorities in support of Defendant's Motion for Summary Judgment or, in the alternative, Partial Summary Judgment on the Complaint filed by Plaintiff Yigal Mesika's ("Plaintiff" or "Mesika"), and each cause of action asserted therein, and on Penguin Magic's counterclaims of Genericness (First), Fraud (Second and Third), and Naked Licensing (Fourth) and its prayer for a finding that this case is exceptional under 15 U.S.C. § 1117.

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................... 1

II.  BACKGROUND ........................................................................................ 1

     A.   This is a Trademark Infringement Case ......................................... 1

          1.   "LOOPS" Are Tied Circles of Elastic Thread ...................... 1

          2.   The Public—Including Mesika—Uses "Loops" to
               Refer to Any Loops of Invisible Elastic Thread ................... 2

          3.   Penguin Magic is a Retailer of Magic Products .................... 4

          4.   Other than Mesika's Products, Penguin Magic Has
               Never Marketed Nor Sold Any Products As
               "LOOPS" ............................................................................... 5

          5.   Mesika's Real Complaint is About Fair Uses of
               "Loops" .................................................................................. 6

     B.   Mesika Does Not Own the "LOOPS" Mark .................................. 7

     C.   Mesika Misrepresented His Ownership of the "LOOPS"
          Mark ............................................................................................... 7

     D.   Mesika Also Falsified Sales and Marketing Figures ..................... 8

     E.   Finn Jon Continues to Use "LOOPS" Without Oversight ............ 9

III. LEGAL STANDARDS ............................................................................ 10

     A.   Ownership ...................................................................................... 10

     B.   Genericness .................................................................................... 10

     C.   Fraud .............................................................................................. 11

     D.   Naked Licensing ............................................................................ 11

     E.   Fair Use & First Sale Doctrine ..................................................... 12

IV.  ARGUMENT ............................................................................................ 12

     A.   Mesika's Counts 1 and 3 and Penguin Magic's
          Counterclaims 1-4 ......................................................................... 12

          1.   Mesika Does Not Own the LOOPS Mark ........................... 13

          2.   The LOOPS Mark is Not Valid ........................................... 13

               a.   The LOOPS Mark is Generic .................................... 13

i

        **b.**    **The LOOPS Mark Was Obtained by Fraud** ............14

        **c.**    **The LOOPS Mark Has Become Abandoned by Naked Licensing** ................................................15

    **3.**    **Penguin Magic's Uses Are Non-Infringing Under the Nominative Fair Use and First Sale Doctrines** .............17

**B.**    **Mesika's Counts 2 and 4** ........................................................18

    **1.**    **Mesika's Complaint Failed to Allege a Claim for Lanham Act Unfair Competition or California False Advertising** ....................................................19

    **2.**    **Mesika's Statements in Subsequent Discovery Failed to Provide Facts on Which Such Claims Could Be Stated** ..........................................................19

**C.**    **Exceptional Case** ...................................................................20

**V.**    **CONCLUSION** ...................................................................................20

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Advertise.com, Inc. v. AOL Advertising, Inc.*,
  616 F.3d 974 (9th Cir. 2010).................................................................11, 14

*Am. Circuit Breaker Corp. v. Oregon Breakers Inc.*,
  406 F.3d 577 (9th Cir. 2005).......................................................................12

*Architectural Mailboxes, LLC v. Epoch Design, LLC*,
  Case No. 10CV974 DMS 2011 WL 1630809, at *5 (S.D. Cal. Apr.
  28, 2011)......................................................................................................19

*Bagdadi v. Nazar*,
  84 F.3d 1194 (9th Cir.1996).........................................................................10

*Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*,
  289 F.3d 589 (9th Cir. 2002)......................................... 11, 15, 16, 17

*Classic Foods Int'l Corp. v. Kettle Foods, Inc.*,
  468 F. Supp. 2d 1181 (C.D. Cal. 2007)..................................................11, 13

*Cleary v. News Corp.*,
  30 F.3d 1255 (9th Cir.1994).........................................................................12

*EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*,
  711 F.Supp.2d 1074 (C.D. Cal. 2010).........................................................19

*FreecycleSunnyvale v. Freecycle Network*,
  626 F.3d 509 (9th Cir. 2010)............................................................ 11, 15, 16

*Gaia Techs. v. Reconversion Techs.*,
  93 F.3d 774 (Fed.Cir.1996).....................................................................10, 13

*Langan v. United Services Automobile Assn.*,
  69 F. Supp. 3d 965, 985 (N.D. Cal. 2014)...................................................19

*Multi Time Machine, Inc. v. Amazon.com, Inc.*,
  804 F.3d 930 (9th Cir. 2015).........................................................................6

iii

*N.W. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
    18 F.3d 1468 (9th Cir.1994) ............................................................... 10

*New Kids on the Block v. News Am. Pub., Inc.*,
    971 F.2d 302 (9th Cir. 1992) ....................................................... 12, 18

*Off. Airline Guides, Inc. v. Goss*,
    6 F.3d 1385 (9th Cir. 1993) .............................................................. 10

*Pom Wonderful LLC v. Hubbard*,
    775 F.3d 1118 (9th Cir. 2014) ......................................................... 12

*Robi v. Five Platters, Inc.*,
    918 F.2d 1439 (9th Cir.1990) ............................................................ 11

*Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*,
    53 F.3d 1073 (9th Cir. 1995) ...................................................... 12, 17

*Secalt S.A. v. Wuxi Shenxi Const. Mach. Co.*,
    668 F.3d 677 (9th Cir. 2012) ........................................................... 20

*Sengoku Works Ltd. v. RMC Int'l, Ltd.*,
    96 F.3d 1217 (9th Cir. 1996) ............................................................ 10

*Southland Sod Farms v. Sover Seed Co.*,
    108 F.3d 1134 (9th Cir.1997) ........................................................... 18

*Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*,
    601 F.2d 1011 (9th Cir. 1979) ......................................................... 11

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
    610 F.3d 1171 (9th Cir. 2010) .................................................... 12, 17

*Vitt v. Apple Computer, Inc.*,
    469 Fed. Appx. 605 (9th Cir.2012) ................................................ 18

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*,
    419 F.3d 925 (9th Cir. 2005) ........................................................... 10

**Rules**

37 C.F.R. § 2.71 ................................................................................. 14

Fed. R. Civ. P. 56 ......................................................................... 1, 10

iv

Fed. R. Civ. P. 9 ................................................................................. 19

**Statutes**

15 U.S.C. § 1057(b) .......................................................................... 10

15 U.S.C. § 1114(1)(a) ....................................................................... 1

15 U.S.C. § 1117 ........................................................................... 1, 20

15 U.S.C. § 1125(a) ............................................................................ 1

Bus. & Prof. Code § 17200 ............................................................... 12

Section 17500 of the California Business and Professions Code ........... 18, 19

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Yigal Mesika is a magician and illusionist. His greatest trick was convincing the Trademark Office to issue him registrations for the generic term LOOPS that actually are primarily used in connection with loops of thread, all based on purported rights he does not actually own. The day before the close of discovery, Mesika finally produced the relevant contract that unambiguously demonstrates that no trademark was assigned to him. There is no genuine issue of material fact: Mesika does not own a valid, protectable trademark right that has been infringed.

## II.    BACKGROUND

### A.    This is a Trademark Infringement Case

Mesika sued Penguin Magic for: (1) federal trademark infringement under 15 U.S.C. § 1114(1)(a); (2) Lanham Act unfair competition under 15 U.S.C. § 1125(a); (3) unfair trade practices under California law; and (4) false advertising under California law. (Compl., DE 1 ¶¶ 14-29).[1] The alleged trademarks are Registration No. 3,782,721 for "LOOPS" as used with "magic tricks" and Registration No. 7,978,477 for "LOOPS" as used with "DVDs featuring magic and levitations" (collectively, the "LOOPS Registrations") (UF ¶¶ 1, 2).

### 1.    "LOOPS" Are Tied Circles of Elastic Thread

Mesika makes and sells gimmicks for use in magic tricks. (UF ¶ 3). Mesika's gimmicks include loops of invisible elastic thread that he literally calls LOOPS. (UF ¶ 3). Invisible elastic thread is very fine thread that can be difficult to see with the naked eye, used by magicians to perform tricks that make it appear as though objects are moving or levitating independently. (UF ¶ 4). Invisible elastic thread may be used in different ways depending on the trick being performed. (UF ¶¶ 4, 5). For some tricks, the thread is formed into a circle, with one end laid over

---

[1]    Citations to Docket Entries are abbreviated "DE"; citations to Uncontested Facts from Penguin Magic's proposed Statement of Uncontroverted Facts and Conclusions of Law are abbreviated "UF".

the other and knotted, forming a loop of thread. (UF ¶ 5).

Through distributors and retailers, Mesika sells these "loops" of invisible elastic thread. (UF ¶ 6). Mesika's product consists of five loops of thread stored on a paper card and accompanied by a set of instructions describing different tricks, such as the "Animated Fork" and the "Haunted Pack." (UF ¶¶ 7, 8). Mesika also sells instructional DVDs entitled LOOPS, on which Mesika demonstrates how to perform tricks using loops of invisible elastic thread, including the "Floating Cigarette," the "Floating Card," and "The Force." (UF ¶¶ 9, 10). None of the tricks described in the instruction set that accompanies the LOOPS invisible elastic thread product or taught by the LOOPS DVDs are called "Loops." (UF ¶¶ 11). Indeed, despite the claim in Registration No. 3,782,721, Mesika does not market any magic tricks called "Loops." (UF ¶ 12).

### 2. The Public—Including Mesika—Uses "Loops" to Refer to Any Loops of Invisible Elastic Thread

The common definition of the word "loops" is "[a] length of line, thread, ribbon, or other thin material that is curved or doubled over making an opening."[2] (UF ¶ 13). For as long as magicians have been tying invisible elastic thread into loops, they have been referring to them as "loops," consistent with the common definition of the word. (UF ¶¶ 15-19). Mesika, too, generically used the word loops to refer to loops of invisible elastic thread, notwithstanding his after-the-fact attempts to monopolize use of that common word. *See infra* at 2-4.

Performing tricks with loops of invisible elastic thread was originally popularized by a magician named Finn Jon, who is credited as the inventor of the product. (UF ¶ 20). In a 1998 contract, pursuant to which Mesika purportedly obtained the right to make and sell the product, Finn Jon's name for the product was "Finn Jon's *Elastic Invisible Thread*." (UF ¶¶ 21, 22). The contract

---

[2]   Other dictionary definitions of loops vary slightly in their wording, but all share a common theme: two ends of an object, crossing over each other, leaving an open space within. (UF ¶ 14).

appropriately used the generic term loops to refer to the product. (UF ¶ 23). It included a 3 year exclusivity provision, pursuant to which third parties would "not be authorized . . . the right of making the Finn Jon's loops of invisible thread." (UF ¶ 24). Nowhere in the contract did the parties contemplate a trademark right in the term "loops" or use the word "loops" as a source-identifying name. (UF ¶ 25).

Likewise, Mesika similarly repeatedly used the word "loops" as the generic description of a tied circle of thread in his U.S. Patent Nos. 7,861,861 and 8,408,394 (collectively, "Mesika Patents") (UF ¶¶ 26, 27). The Mesika Patents are directed to a "[c]ontainer for holding elastic loops." (UF ¶ 28). The container is a sheet, upon which "an elastic loop is placed," together with a separator that covers the "elastic loops" and holds them against the sheet. (UF ¶ 29).

Throughout the Mesika Patents the term "loop(s)" is repetitively used—almost 200 times—to refer to any loops of invisible elastic thread, and not to products sourced by Mesika. (UF ¶ 30). Indeed, the term is not ever used in bold, underlined, or large font. (UF ¶ 31). For example, in the background of the invention, the Mesika Patents explain that "Elastic loops have long been known in the art. By way of example, elastic loops are often considered rubber bands and used to hold items together . . . . [M]agicians have developed elastic loops that are barely visible and used for magic tricks. Such thin loops allow the magician to . . . ." (UF ¶ 32). According to the Mesika Patents, "[w]hen storing such loops, they are typically placed in a box, purse, or other location that results in the loops becoming bunched up and otherwise disorganized." (UF ¶ 33). The Mesika Patents allegedly provide a solution to a magicians' need for "a convenient container to hold the loops in a convenient and organized manner." (UF ¶ 34). Throughout the Mesika Patents, the terms "loops," "elastic loops," and "invisible elastic loops" are used dozens of times, interchangeably, and not once to refer specifically to tied circles of elastic thread originating from Mesika. (UF ¶ 35).

To that end, for example, Wikipedia's online glossary of magic displays a

host of generic magic terms, such as "flash paper", "gimmick", "invisible deck", and "magic dust" and specifically defines the term "loop" in that dictionary as "[a] super-thin elastic string, tied into a small circular loop, worn on the wrist. Used for levitating small, lightweight objects and many PK effects." (UF ¶ 36).

Despite the foregoing, Mesika now claims that he has the exclusive right to use the term "loops" in connection with such loops of elastic thread.[3]

### 3.  Penguin Magic is a Retailer of Magic Products

Penguin Magic is one of the largest Internet retailers of magic products. (UF ¶ 37). Penguin Magic sells hundreds of products, including Mesika's products. (UF ¶ 38). Through discovery, the parties identified a specific set of relevant products sold by Penguin Magic. (UF ¶ 39). Most of these products are Mesika products that were purchased from Mesika's authorized distributors:

| | |
|---|---|
| Innercircle by Yigal Mesika | Loops by Yigal Mesika |
| Loops by Yigal Mesika (3 pack) | Loops Improved by Yigal Mesika |
| Loops COMPLETE by Yigal Mesika (2DVD set + 20 Loops) | Loops Vol. 1-2 by Yigal Mesika and Finn Jon (2 DVDs) |
| Loops New Generation by Yigal Mesika | Mesika Elastics by Yigal Mesika |
| Yigal Mesika's Animated Miracles Book | |

(UF ¶¶ 39-51, 55).[4]

The remaining allegedly relevant products sold by Penguin Magic are:

---

[3]  Mesika has a pattern of claiming generic terms as his own – the evidence indicates that, in addition to use of the term "loops" in connection with loops of thread, he sent a demand letter claiming exclusive rights to the generic term "invisible elastic bands." (UF ¶¶ 132-133).

[4]  While Mesika appears to believe some speculative fraction of these products are items that did not originate from Mesika (UF ¶ 52), he has produced no actual evidence that Penguin Magic has ever sold anything but genuine Mesika products under these names. (UF ¶ 53). Mesika's suspicion that a few isolated critical reviews of his product must mean that the products are not genuine is unfounded—there is no evidence that any review of a Mesika product relates to anything other than a consumer who was unhappy with Mesika's genuine product. Every Mesika brand product sold by Penguin Magic was properly sourced from Mesika's authorized distributors. (UF ¶¶ 40-51, 55).

4

| The Million Dollar Knot (Instant Download + PET2.0) |
| Legacy Thread by Sebashtion (300ft Spool) |
| As Real As It Gets by Losander (DVD kit) |

(UF ¶ 39).

### 4.    Other than Mesika's Products, Penguin Magic Has Never Marketed Nor Sold Any Products As "LOOPS"

Penguin Magic markets and sells products to consumers on its website at www.penguinmagic.com. (UF ¶ 54). <u>Penguin Magic does not and has never sold any products—other than Mesika's—bearing the name "LOOPS" whatsoever.</u> (UF ¶ 55). A user searching Penguin Magic's website for "loops" will get results for Mesika's products and no other invisible elastic thread product or DVD described as "LOOPS". (UF ¶ 56). The Million Dollar Knot, Legacy Thread, and the As Real As It Gets DVD Kit are not among the results for a search of the term "loops" on the website. (UF ¶¶ 57-59). Penguin Magic also uses a "tag" system that assigns relevant keywords to particular products. (UF ¶ 60). For example, a product that may be useful for "close up" magic may be assigned the tag "close-up" or one that features playing cards assigned "card-trick." (UF ¶¶ 61, 62). The Million Dollar Knot, Legacy Thread, and As Real As It Gets DVD Kit are not tagged with the "loops" tag. (UF ¶ 63-65).

Penguin Magic also uses meta "tags" or keywords, which can assist in the indexing of its website by third-party search engines. (UF ¶ 66). On each product page, Penguin Magic uses three categories of meta information: (1) a description; (2) keywords; and (3) product classification. (UF ¶ 67). The first, "description," consists of the first 225 characters of the product's description on a product page. (UF ¶ 68). The product descriptions for the Million Dollar Knot, Legacy Thread, and As Real As It Gets DVD Kit do not include the term "loops." (UF ¶¶ 69-72). The second and third, "keywords" and "classification," are fixed values that are the

same on every page of Penguin Magic's website. (UF ¶¶ 72, 73).[5] In this respect, Penguin Magic goes far beyond what is required by the law, which permits a website search to suggest competitive products even when the site does <u>not</u> carry the product that was the subject of the original search (*see, e.g., Multi Time Machine, Inc. v. Amazon.com, Inc.,* 804 F.3d 930 (9th Cir. 2015)).

## 5. Mesika's Real Complaint is About Fair Uses of "Loops"

Given that there is no question Penguin Magic does not sell The Million Dollar Knot, Legacy Thread, or the As Real As It Gets DVD Kit under the LOOPS Mark, the alleged bases for Mesika's infringement claims appear to arise solely out of fair uses of the word "loops." For example, while Mesika does not allege that Penguin Magic passed off The Million Dollar Knot—an instruction video on how to tie loops of invisible elastic thread—as his LOOPS product, Mesika complains that the video taught consumers how to "make" his product. (UF ¶¶ 75-77). Similarly, Mesika does not allege that Penguin Magic sold Legacy Thread—a spool of invisible elastic thread—under the LOOPS Mark, but that Penguin Magic touted the product as a cheaper alternative to Mesika's product. (UF ¶¶ 78-81). Likewise, Mesika does not allege that Penguin Magic touted the As Real As It Gets DVD Kit as including Mesika LOOPS. (UF ¶¶ 82, 83). Rather, Mesika complains that the instructional video referred to tied circles of invisible elastic bands as "loops," and that the kit included with the DVD non-branded loops of invisible elastic thread.[6] (UF ¶¶ 84). There is no evidence that the video referred to the

---

[5]   The "keywords" values are "magic tricks, ""magic shops," "card tricks," "street magic," "levitation," "magic store," and "magic supplies." (UF ¶ 72). The "classification" values are "magic tricks," "magic shop," "card tricks," "street magic," "levitation," "card magic," "magic store," "magic supply," and "magic supplies." (UF ¶ 73). Nowhere on the Penguin Magic website does the term "loops" appear as a "keyword" or "classification" meta value. (UF ¶ 74).

[6]   For business reasons and to avoid the present dispute, Penguin Magic in good faith voluntarily changed what was a small portion of its practice and included Mesika LOOPS shortly after Mesika complained about the issue to Penguin Magic. (UF ¶ 85). This was not a concession as to the merits of Mesika's claim, but an accommodation intended to avoid an unnecessary and frivolous dispute. (UF ¶ 86). As a result, despite the lack of any legal requirement, the vast majority of As Real As It Gets DVD Kits sold by Penguin Magic have included Mesika LOOPS, and

thread that came with the kit as Mesika's LOOPS. (UF ¶ 87).

## B.   Mesika Does Not Own the "LOOPS" Mark

Mesika owns the LOOPS Registrations, but he does not now own—and never previously owned—any LOOPS trademark, to the extent any such trademark ever existed. (UF ¶¶ 88-90). According to Mesika, he obtained "common law" trademark rights to the mark LOOPS from Finn Jon in 1998. (UF ¶ 91). Jon had allegedly been using the mark previously since 1986. (UF ¶ 92).

The only documentation of any transfer of rights between Jon and Mesika is a contract dated June 25, 1998. (UF ¶ 93). The parties to the contract are Mesika and Georges Proust of Paris, France. (UF ¶ 94). According to Mesika, Proust was the authorized representative or agent of Jon. (UF ¶ 95). By the terms of the contract, Proust granted to Mesika "permission to make and sell the Finn Jon's *Elastic Invisible Thread* for which Mr. Proust owns the rights and copyrights." (UF ¶ 96, italic in original). The contract did not transfer ownership of any rights to Mesika. (UF ¶ 97). To the contrary, the contract expressly provided that "[i]t must be agreed that Mr. Proust remains the **one and only owner of the invention.** He doesn't give any exclusive right to Mr. Yigal Mesika, especially the right of reselling it." (UF ¶ 98) (emphasis in original). Thus, if anything, the contract was simply a non-exclusive license *to* Mesika, with a limited initial exclusivity period that has since expired. (UF ¶ 99).

## C.   Mesika Misrepresented His Ownership of the "LOOPS" Mark

Mesika repeatedly misrepresented his ownership of the "LOOPS" mark to the Trademark Office. (UF ¶ 100). When Mesika filed his applications, he identified himself as the owner of the LOOPS mark. (UF ¶¶ 101-102). In each subsequent submission, including his statements in support of incontestability, Mesika repeatedly recertified that he was the owner of the LOOPS mark, when he was not and the mark was generic. (UF ¶¶ 103-111).

Mesika has produced no evidence to the contrary. (UF ¶¶ 85, 86).

1   In addition, in response to the Trademark Office's descriptiveness rejection
2   of the applications, Mesika expanded on his false claim, alleging that Finn Jon was
3   his "predecessor in interest to the common law mark Loops." (UF ¶¶ 106-17).
4   Mesika argued that the LOOPS Mark had acquired distinctiveness through his
5   efforts combined with those of Jon. (UF ¶¶ 108-109). Attached to that response,
6   Mesika included a purported declaration of Jon allegedly confirming his transfer of
7   rights to Mesika, and the mere retention of a license to use the product
8   concurrently with Mesika. (UF ¶¶ 110-111). The statements in Mesika's submitted
9   response and in Jon's declaration, contradict the plain language of the contract by
10  which Mesika obtained a license to Jon's rights in the product he invented, for
11  which Jon's trade name was *Elastic Invisible Thread*. (UF ¶¶ 112-113).

### D.    Mesika Also Falsified Sales and Marketing Figures

13  As further fraudulent support of his claim for acquired distinctiveness,
14  Mesika submitted false information about the sales and advertising of products
15  allegedly bearing the LOOPS Mark. (UF ¶¶ 114-121). Without any supporting
16  advertisements or financials, Mesika claimed that "millions of dollars" had been
17  spent in advertising, and that direct retail sales had amounted to "approximately
18  $1.5 million in the same period." (UF ¶¶ 114-117). The claim is false on its face—
19  a product that requires multiple "millions" in advertising to achieve only $1.5
20  million in sales is running at a loss. (UF ¶¶ 114-117). Mesika was attempting to
21  buttress his claim of acquired distinctiveness by inflating such numbers so that the
22  Trademark Office would withdraw its rejection—after being defrauded into
23  believing Finn Jon had originally used loops as a trademark. (UF ¶¶ 114-117).

24  In discovery, Mesika has failed to provide documentation of anything
25  resembling millions of dollars in advertising or annual sales. (UF ¶¶ 118-119).
26  Despite repeated requests for additional documentation, Mesika produced during
27  discovery evidence of no more than tens of thousands of dollars in advertising and
28  hundreds of thousands of dollars in sales. (UF ¶¶ 118-119). Moreover, all of this

evidence postdates his submission of acquired distinctiveness, and therefore necessarily cannot be used to support the claims made to the Trademark Office. (UF ¶¶ 120-121). As it stands, there is no evidence—short of Mesika's naked, uncorroborated declarations, which contradict the very contract evidencing Jon's generic use of loops—of the sales and advertising on which the Trademark Office mistakenly allowed the LOOPS Registrations to issue. (UF ¶¶ 114-121).

### E.   Finn Jon Continues to Use "LOOPS" Without Oversight

Even if Mesika owns the LOOPS mark as he claimed to the Trademark Office, by those same representations Finn Jon retained an unfettered license to use the LOOPS mark. (UF ¶¶ 122-131). Mesika, by his own admission, does not exercise *any* control and does not even have the right to exercise any control over Jon's use of the LOOPS mark. (UF ¶¶ 122-123). Jon may use the LOOPS mark with loops of invisible elastic thread, on DVDs featuring magic and levitation, in association with magic tricks, or in any other way without restriction. (UF ¶¶ 122-123).

There is no avenue by which Mesika can ensure the quality of the LOOPS mark. (UF ¶ 122). Mesika has no right to inspect, supervise, approve, or otherwise direct the use of the mark or the quality of the products with which it is associated.[7] (UF ¶¶ 122, 124). Mesika has no published policies or procedures with which Jon could voluntarily comply. (UF ¶ 126). And Mesika and Jon do not have the type of close working relationship that in other circumstances might arguably substitute for the absence of such controls. (UF ¶¶ 127).[8] The two did not share sources for invisible elastic thread or manufacture it for each other. (UF ¶¶ 128-130). Even in the context of this litigation, Mesika did not know the location of Jon or of any way to contact him. (UF ¶ 127). What little Mesika does know of Jon's use of the

---

[7]   Under the terms of the contract, it is *Jon or Proust* who have the right to supervise and inspect the quality of *Mesika's* products. (UF ¶ 124).

[8]   Indeed, Mesika disparages the quality of Jon's loops openly (UF ¶¶ 125).

1  LOOPS mark is clear: Mesika explicitly contends that Jon's product is of an

2  inferior quality to his own (UF ¶ 131).

3  **III.    LEGAL STANDARDS**

4         Summary judgment allows courts to avoid unnecessary trials where no

5  material factual dispute exists. *N.W. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

6  F.3d 1468, 1471 (9th Cir.1994). The court must view the evidence and the

7  inferences arising therefrom in the light most favorable to the nonmoving party,

8  *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.1996), and should award summary

9  judgment where no genuine issues of material fact remain in dispute and the

10  moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

11        **A.    Ownership**

12        A party lacks standing to sue for trademark infringement if it does not own

13  the trademark at issue. *Gaia Techs. v. Reconversion Techs.*, 93 F.3d 774, 777

14  (Fed.Cir.1996). "When proving ownership of a trademark, federal registration of

15  the mark is prima facie evidence that the registrant is the owner of the mark." 15

16  U.S.C. § 1057(b). However, the non-registrant can rebut this presumption by

17  showing that the registrant had not established valid ownership rights in the mark

18  at the time of registration." *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217,

19  1220 (9th Cir. 1996).

20        **B.    Genericness**

21        "The generic name of a product—what it is—can never serve as a

22  trademark." *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir. 1993).

23  "To determine whether a term has become generic, [the courts] look to whether

24  consumers understand the word to refer only to a particular producer's goods or

25  whether the consumer understands the word to refer to the goods themselves."

26  *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 929

27  (9th Cir. 2005). "A mark answers the buyer's questions 'Who are you?' 'Where do

28  you come from?' 'Who vouches for you?' But the generic name of the product

10

answers the question 'What are you?'" *Advertise.com, Inc. v. AOL Advertising, Inc.*, 616 F.3d 974, 977 (9th Cir. 2010). "If buyers take the word to refer only to a particular producer's goods or services, it is not generic." *Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1016 (9th Cir. 1979). "But if the word is identified with all such goods or services, regardless of their suppliers, it is generic and so not a valid mark." *Id.* Once a word or phrase has become generic for a product (*e.g.,* the name of a new invention or gimmick), and is in the public domain, it cannot thereafter become trademark for that product. *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 468 F. Supp. 2d 1181, 1188 (C.D. Cal. 2007).

## C.     Fraud

A trademark registration may be cancelled for fraud on the Trademark Office when (1) the registrant made a false representation regarding a material fact; (2) the registrant knew the representation was false; (3) the registrant intended to induce reliance upon the misrepresentation; (4) there was actual, reasonable reliance on the misrepresentation; and (5) damages were proximately caused by that reliance. *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir.1990).

## D.     Naked Licensing

"'Naked licensing' occurs when the licensor fails to exercise adequate quality control over the licensee." *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515 (9th Cir. 2010). "[N]aked licensing is inherently deceptive and constitutes abandonment of any rights to the trademark by the licensor." *Id.* at 516. "Consequently, where the licensor fails to exercise adequate quality control over the licensee, a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark." *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 596 (9th Cir. 2002). "Such abandonment is purely an 'involuntary' forfeiture of trademark rights, for it need not be shown that the trademark owner had any subjective intent to abandon the mark." *Id.*

11

### E.  Fair Use & First Sale Doctrine

Nominative fair use is a defense to a trademark claim. *See New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 306–08 (9th Cir. 1992). The doctrine protects a defendant "where the use of the trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a different one." *Id.* at 308. The defense may be invoked "where a defendant uses the mark to refer to the trademarked good itself." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175 (9th Cir. 2010). This principle recognizes the proposition that "[t]rademark law generally does not reach the sale of genuine goods bearing a true mark even though such sale is without the mark owner's consent." *Am. Circuit Breaker Corp. v. Oregon Breakers Inc.*, 406 F.3d 577, 585 (9th Cir. 2005). Likewise, under the first sale doctrine, "the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product." *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir. 1995) ("Resale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition.").

## IV.  ARGUMENT

Penguin Magic is entitled to summary judgment in its favor.

### A.  Mesika's Counts 1 and 3 and Penguin Magic's Counterclaims 1-4

Mesika's Count 1 is for federal trademark infringement under the Lanham Act, the elements of which are (1) ownership in a valid, protectable trademark; and (2) use of a competing mark by an alleged infringer that is likely to cause consumer confusion. *See Pom Wonderful LLC v. Hubbard,* 775 F.3d 1118, 1124 (9th Cir. 2014). Count 3 is for unfair trade practices under California law, Bus. & Prof. Code § 17200, but "state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act." *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir.1994). Thus, a common element of each is

the ownership of a valid, protectable trademark. As set forth below, there is no genuine issue of material fact that: (1) Mesika does not own the LOOPS mark; and (2) the LOOPS mark is not a valid, protectable trademark. For the same reasons, there is no genuine issue of material fact as to Penguin Magic's counterclaims that the LOOPS Mark is generic, that the LOOPS Registrations were obtained by fraud, and that the LOOPS Mark is invalid as abandoned due to naked licensing. Alternatively, under the same facts, Penguin Magic's use of the LOOPS mark is non-infringing under the nominative fair use and first sale doctrines.

### 1. Mesika Does Not Own the LOOPS Mark

Mesika claims ownership to the LOOPS Mark through a transfer of rights from his alleged predecessor in interest, Finn Jon. (UF ¶ 91). The only such transfer of rights, however, was not an assignment of Jon's rights to Mesika. (UF ¶¶ 93-99). Rather, it was merely a non-exclusive license for a fixed number of years. (UF ¶¶ 93-99). Mesika did not obtain ownership of any LOOPS Mark from Finn Jon and does not have standing to bring actions based on such alleged ownership. *Gaia Techs. v. Reconversion Techs.*, 93 F.3d 774, 777 (Fed.Cir.1996).

### 2. The LOOPS Mark is Not Valid

#### a. The LOOPS Mark is Generic

Mesika cannot prevail in his claims because the LOOPS Mark is generic, and therefore the LOOPS Registrations are invalid. (UF ¶¶ 13-6). As evidenced by its use in the 1998 contract, the term "loops" has never been more than a generic name for any product that is a loop of invisible elastic thread. (UF ¶¶ 21-25). Mesika cannot take a generic name for a product and trademark it. *Classic Foods*, 468 F. Supp. 2d at 1188. Since then, consumers, other magicians, and Mesika himself have continued to use the term interchangeably to describe any such loop of invisible elastic thread. (UF ¶¶ 15-19). They use the term when discussing how to make their own loops of thread—not how to make imitations of Mesika's products. (UF ¶¶ 15-19). Thus, the term "loops" does not identify who has made

the loop, where it comes from, or who vouches for it. (UF ¶¶ 15-19). Rather, it merely describes what the product is, regardless of who supplied it. (UF ¶¶ 15-19). The mark is invalid as generic. *Advertise.com*, 616 F.3d at 977.

### b.    The LOOPS Mark Was Obtained by Fraud

Mesika made knowingly false representations of material fact to the Trademark Office. (UF ¶¶ 134). Mesika intended the Trademark Office to rely on those misrepresentations, and the Trademark Office did rely on those misrepresentations, when issuing the LOOPS Registrations. (UF ¶¶ 136, 142, 148).

First, Mesika repeatedly made false statements to the Office about the ownership of the LOOPS Mark. (UF ¶¶ 134, 135). As shown in his license, *Elastic Invisible Thread* was the trade name of Finn Jon's loops of elastic thread, and Finn Jon and/or Georges Proust retained ownership of any and all rights related thereto. (UF ¶¶ 93-99). Mesika is nothing more than a non-exclusive licensee. (UF ¶¶ 93-99). Mesika's misrepresentations are in direct contradiction to the license that made explicit the retained ownership rights of the licensor and was plainly intentional to obtain trademark rights.[9] (UF ¶¶ 112-113, 135). It was also material—without it, the LOOPS Registrations would not have issued and the applications held void *ab initio*. (UF ¶¶ 137-139); *see also* 37 C.F.R. § 2.71 ("An application filed in the name of an entity that did not own the mark as of the filing date of the application is void.").

Mesika also necessarily misstated the length of use of the mark as well as the amount of sales of and advertising spent on products allegedly bearing the LOOPS Mark. (UF ¶¶ 114-121, 140-142, 146-148). During prosecution, the Office rejected the applications as merely descriptive. (UF ¶¶ 108, 109, 143-145, 149-151). To overcome the descriptiveness rejection, Mesika alleged that the LOOPS Mark had acquired distinctiveness under Section 2(f) of the Lanham Act based on

---

[9]   Mesika's intent is further evidenced by his habit of making false statements about the scope of his IP rights. (UF ¶¶ 132-133)

millions of dollars' worth of advertising and sales. (UF ¶¶ 114-117, 143-145, 149-151). Mesika has not and cannot, however, document any of this alleged substantial spending and revenue promoting "LOOPS" as a trademark (as opposed to generic use of the term as exemplified in Mesika's license with Finn Jon). (UF ¶¶ 118-119, 140-142, 146-148). Despite specifically being asked to produce such materials during discovery, Mesika produced no documentation of advertising or sales prior to his submission of his Section 2(f) statement. (UF ¶¶ 118-119, 140-142, 146-148). Instead, Mesika produced evidence of nothing more than a total of a mere tens of thousands of dollars in advertising and hundreds of thousands of dollars in sales, all postdating the Section 2(f) statement. (UF ¶¶ 118-121, 140-142, 146-148). The misrepresentations were intentional and material, because without them, the Office would not have found the LOOPS Mark had acquired distinctiveness nor issued the registrations. (UF ¶¶ 143-145, 149-151).

### c.    The LOOPS Mark Has Become Abandoned by Naked Licensing

To the extent Mesika owns the rights in the LOOPS Mark, and Finn Jon is the licensee, the rights to the LOOPS Mark have been abandoned by virtue of Mesika's naked license to Jon. By his own admissions, there is no agreement between Mesika and Jon governing Jon's use of the LOOPS Mark, and Mesika exercises zero control over that use. (UF ¶ 123). Mesika has no right to inspect Jon's products or advertising. (UF ¶ 122). Mesika has no right to supervise or direct Jon's use, such as the font, size, appearance, or position on packaging. (UF ¶ 124). In fact, Mesika concedes that he does not exercise *any* quality control over Jon's use and that Jon's products are of an inferior quality. (UF ¶ 123).

The facts here are considerably stronger than those in *Freecycle* and *Barcamerica*, where the courts invalidated marks. In those cases, the Ninth Circuit affirmed summary judgment findings that the alleged mark was invalid due to naked licensing.

15

In *Freecycle*, Freecycle Network permitted members of its network to use the mark absent any express contractual or actual control over their use of the mark. 626 F.3d at 511-512. The members all used online service providers, such as Yahoo! Groups, to host electronic bulletin boards. *Id.* at 512. Despite those service providers having general usage guidelines, and the Freecycle Network posting ethos and etiquette guidelines to its own website, the Ninth Circuit found that the Freecycle Network had abandoned its marks through naked licensing by failing to maintain adequate quality control over the members use. *Id.* at 516-18.

In *Barcamerica*, Barmerica entered into a written license agreement with a wine producer to use the mark in connection with the sale of wine. 289 F.3d at 591-92. The contract did not, however, include any form of quality control provisions. *Id.* at 592. And the only evidence of actual "quality control" was the principle of the licensor occasionally, informally tasting the wine. *Id.* In affirming the district court's holding that the mark was invalid for naked licensing, the Ninth Circuit conceded that it can be difficult to "define in the abstract exactly how much control and inspection is needed to satisfy the requirement of quality control." *Id.* at 598. The Court observed that the licensor could have at least sampled, in some organized way, an adequate number of bottles to ensure that they were of sufficient quality, but the licensor "did not make even this minimal effort." *Id.*

Here, the facts even stronger against Mesika. By his own admissions, he has no formal license agreement with Finn Jon, and thus necessarily has no contractual rights of inspection or quality control. *FreecycleSunnvale*, 626 F.3d at 516 ("The absence of an agreement with provisions restricting or monitoring the quality of goods or services produced under a trademark supports a finding of naked licensing."). More to the point, Mesika does not exercise any actual control over Jon's use of the marks. *Id.* at 516–17 ("[W]here courts have excused the lack of a contractual right to control quality, they have still required that the licensor demonstrate actual control through inspection or supervision"). The Ninth Circuit

expected the licensor in *Barcamerica* to do some minimal amount of annual testing and inspection. 289 F.3d at 598. Mesika not only does not make a minimal effort to exercise control—he is aware of Jon selling inferior products using the LOOPS Mark and he does nothing to stop or otherwise remedy the situation. (UF ¶ 125). Rather, Mesika disparages the quality of Jon's loops openly (UF ¶ 125, 131).

Assuming Mesika had any trademark rights, this would be an egregious case of naked licensing whereby Mesika would have abandoned such rights. "[I]t is well established that where a trademark owner engages in naked licensing, without any control over the quality of goods produced by the licensee, such a practice is inherently deceptive and constitutes abandonment of any rights to the trademark by the licensor." *Barcamerica*, 289 F.3d at 598. Accordingly, the Court should hold the LOOPS Registrations and the LOOPS Mark invalid.

### 3.   Penguin Magic's Uses Are Non-Infringing Under the Nominative Fair Use and First Sale Doctrines

Even if Mesika owns a protectable right in the LOOPS Mark, Penguin Magic has done nothing to infringe that right. (UF ¶¶ 39-87). Of the relevant products identified by the parties, the vast majority that Penguin Magic has sold were purchased through Mesika's authorized distributors. (UF ¶¶ 39-51, 55). It is not an act of infringement to use Mesika's marks to identify Mesika's products. *Toyota*, 610 F.3d at 1175; *see also Sebastian Int'l*, 53 F.3d at 1074 ("Resale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition.").

Penguin Magic's alleged use of the LOOPS Mark in association with the remaining products—The Million Dollar Knot, Legacy Thread, and As Real As It Gets DVD Kit—is also protected under the doctrine of nominative fair use. Penguin Magic is not using the LOOPS Mark to describe these products. (UF ¶¶ 54-73). Mesika complains that Penguin Magic is selling these products while stating that they can be "used to make loops" or because they teach tricks "using

17

loops," but even if true, such uses are not "attempt[s] to capitalize on consumer confusion or to appropriate the cachet of one product for a different one." *New Kids on the Block*, 971 F.2d at 306–08. Accordingly, even if Mesika has protectable rights, Penguin Magic has not infringed those rights as a matter of law.

### B.   Mesika's Counts 2 and 4

Count 2 is for federal unfair competition under the Lanham Act, the elements of which are "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." *Southland Sod Farms v. Sover Seed Co.,* 108 F.3d 1134, 1139 (9th Cir.1997).

Similarly, Count 4 is for "Unfair Trade Practices – False or Misleading Statements when Advertising One's Goods." Section 17500 of the California Business and Professions Code,[10] makes it unlawful for a business to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." "[T]o be actionable as an affirmative misrepresentation, a statement must make a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Vitt v. Apple Computer, Inc.*, 469 Fed. Appx. 605, 607 (9th Cir.2012).

"Because claims under the FAL are 'grounded in fraud,' they must satisfy the heightened pleading standards of Rule 9(b)." *Langan v. United Services*

---

[10]   Although Mesika's complaint cites Bus. & Prof. Code § 17250, it is believed that this should be a citation to Bus. & Prof. Code § 17500, as there is no § 17250.

*Automobile Assn.*, 69 F. Supp. 3d 965, 985 (N.D. Cal. 2014). And although the Ninth Circuit has not concluded that Rule 9(b) applies to Lanham Act unfair competition, many district courts—including in this district—have applied the heighted pleading standard to such claims. *EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*, 711 F.Supp.2d 1074, 1085 (C.D. Cal. 2010); *see also Architectural Mailboxes, LLC v. Epoch Design, LLC*, Case No. 10CV974 DMS CAB, 2011 WL 1630809, at *5 (S.D. Cal. Apr. 28, 2011) (collecting cases).

### 1. Mesika's Complaint Failed to Allege a Claim for Lanham Act Unfair Competition or California False Advertising

Mesika's Complaint failed to allege facts sufficient to state claims for Lanham Act unfair Competition or False Advertising under Bus. & Prof. Code § 17500. "To satisfy Rule 9(b), [Mesika] must state the 'time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation.'" *EcoDisc*, 711 F.Supp.2d at 1085. "Further, [Mesika] must set forth what is false or misleading about a statement, and why it is false." *Id.*

Mesika's Complaint does neither. At most, Mesika vaguely contends that Penguin Magic "advertises, markets, offers for sale, and sells products that compete with [Mesika]" and that those products are "described as originating from Mesika by actually an inferior product not authorized by [Mesika]." (Compl., DE 1 at ¶ 11). Mesika never identifies the products Penguin Magic is allegedly falsely describing as originating from Mesika, as there are none. Mesika also does not identify where and when those allegedly false descriptions were made, to whom they were made, of what the descriptions consisted, or why the descriptions were false. Mesika has failed to plead facts sufficient to support Counts 2 and 4.

### 2. Mesika's Statements in Subsequent Discovery Failed to Provide Facts on Which Such Claims Could Be Stated

Mesika failed to supplement the inadequacy of his pleading with any discovery that could support the claims set forth in Counts 2 and 4. For example,

1  Penguin Magic requested by way of interrogatory a detailed statement forming the

2  bases of Mesika's claims. (UF ¶ 152). In response, Mesika stated that Penguin

3  Magic had "(1) advertised and marketed; (2) offered to sell; and (3) sold "products

4  under the trademark 'Loops' without authorization and contrary to [Mesika's]

5  exclusive right." (UF ¶ 153). Mesika did not identify any actual false statements or

6  state how they were deceiving to consumers. (UF ¶ 154). Mesika also stated that

7  Penguin Magic had used LOOPS as a keyword or meta tag on its website, but

8  failed to identify on what pages those tags were used or how they were deceptive

9  in that context. (UF ¶ 155). In short, summary judgment against Counts 2 and 4 is

10  warranted, not just on the pleadings, but because there is no evidence on each

11  element of unfair competition or false advertising.

12        **C.**   **Exceptional Case**

13       "The court in exceptional cases may award reasonable attorney fees to the

14  prevailing party." 15 U.S.C. § 1117(a). An action may be considered exceptional

15  "[w]hen a plaintiff's case is groundless, unreasonable, vexatious, or pursued in bad

16  faith." *Secalt S.A. v. Wuxi Shenxi Const. Mach. Co.*, 668 F.3d 677, 687 (9th Cir.

17  2012). This is such a case. During discovery, Mesika did not return the proposed

18  protective order for months, refused to articulate a cogent infringement theory

19  despite repeated requests, and failed to produce the most relevant documents until

20  the eve of the close of fact discovery. The contract with Jon—the entire basis for

21  Mesika's alleged rights, and which ultimately shows Mesika does not have

22  standing to pursue these claims—was only produced at Mesika's deposition on the

23  day before the close of discovery. (UF ¶ 156).

24  **V.**   **CONCLUSION**

25       WHEREFORE, Penguin Magic prays the Court enter an order granting it

26  summary judgment in its favor, and for all other relief that it finds just and proper.

27

28

Dated:  September 28, 2016       By:  /s/Todd Malynn
                                      POLSINELLI PC

## **CERTIFICATE OF SERVICE**

I certify that on September 28, 2016, the foregoing document was served on Plaintiffs' counsel of record by operation of the Court's CM/ECF system.


By:  /s/Todd Malynn
     POLSINELLI PC